

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2005 FEB 14 · A 9: 56

LORETTA G. WHYTE
CLERK

Received in Chambers 2/14/05 /tg

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHRISTOPHER HUTCHINSON | * | CIVIL ACTION NO. 03-1275 |
| | * | |
| VERSUS | * | SECTION "M" |
| | * | |
| NOBLE DRILLING (U.S.) INC. | * | MAGISTRATE "4" |
| *   *   *   *   *   *   * | * | |

### MOTION *IN LIMINE* TO EXCLUDE OPINIONS AS TO MEDICAL CAUSATION AND CUMULATIVE MEDICAL TESTIMONY

Defendant, Noble Drilling (U.S.) Inc., moves this Honorable Court exclude the testimony of the Plaintiff's physicians as to the cause of the Plaintiff's alleged complaints because those opinions hinge on the temporal connection between the Plaintiff's alleged exposure to chemicals and his alleged illness. Without any scientific foundation as to the concentration or duration of exposure to these chemicals that is required to produce any adverse medical effects, and no evidence of the concentration or duration of exposure to which the Plaintiff was allegedly subjected, the opinions are scientifically unreliable as a matter of law. Furthermore, when the Plaintiff's complaints admittedly would be attributable to the diagnosed condition of GERD without the history of exposure provided by the Plaintiff, those opinions are even more suspect.

Additionally, to allow the Plaintiff to call multiple physicians at trial concerning the treatment, diagnosis and cause of his complaints is cumulative and would be overly prejudicial. With Noble limited to two physicians testifying as to the cause of the Plaintiff's breathing and

Fee____
Process____
X Dktd____
✓ CtRmDep____
Doc. No. 52

throat complaints, Plaintiff should be limited to one pulmonologist and one otolaryngologist as well.

WHEREFORE, Noble Drilling (U.S.) Inc. respectfully requests that this Honorable Court exclude any opinions as to medical causation and limit the Plaintiff to calling one pulmonologist and otolaryngologist at trial of this matter.

Respectfully submitted,

THOMAS J. SMITH, T.A. (#17148)
TIMOTHY W. HASSINGER (#25085)
Galloway, Johnson, Tompkins, Burr & Smith
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139
Telephone: (504) 525-6802
Facsimile: (504) 525-2456
**Counsel for Noble Drilling (U.S.) Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon counsel of record by hand delivery this 14th day of February, 2005.

_____
TIMOTHY W. HASSINGER

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon counsel of record by hand delivery this 14th day of February, 2005.

_____
TIMOTHY W. HASSINGER

3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHRISTOPHER HUTCHINSON | * | CIVIL ACTION NO. 03-1275 |
| | * | |
| VERSUS | * | SECTION "M" |
| | * | |
| NOBLE DRILLING (U.S.) INC. | * | MAGISTRATE "4" |
| * * * * * * * | * | |

### MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE OPINIONS AS TO MEDICAL CAUSATION AND CUMULATIVE MEDICAL TESTIMONY

MAY IT PLEASE THE COURT:

Defendant, Noble Drilling (U.S.) Inc., respectfully moves this Honorable Court exclude the testimony of the Plaintiff's physicians as to the cause of the Plaintiff's alleged complaints because those opinions hinge on the temporal connexity between the Plaintiff's alleged exposure to two chemicals and his alleged illness. Without any foundation as to the concentration or duration of exposure to these chemicals that must be required to produce any adverse medical effects, and no evidence of the concentration or duration of exposure to which the Plaintiff was subjected, the opinions are scientifically unreliable as a matter of law. Furthermore, when the Plaintiff's complaints admittedly would be attributable to the diagnosed condition of GERD without the history of exposure provided by the Plaintiff, those opinions are even more suspect.

Additionally, to allow the Plaintiff to call multiple physicians at trial concerning the treatment, diagnosis and cause of his complaints is cumulative and would be overly prejudicial.

With Noble limited to two physicians testifying as to the cause of the Plaintiff's breathing and throat complaints, Plaintiff should be limited to one pulmonologist and one otolaryngologist as well.

## FACTUAL BACKGROUND

### I.  PLAINTIFF CHANGED HIS STORY AFTER FILING A LAWSUIT

The Plaintiff, Christopher Hutchinson, a former motorman and mechanic aboard Noble's drilling rig HOMER FERRINGTON, filed suit against Noble alleging that he suffered "chemically induced pulmonary disease with upper airway problems" after he was exposed to or inhaled "noxious" (but unspecified) chemicals aboard the rig.  He also alleges periods of "acute exacerbation with marked shortness of breath," which is not surprising considering the Plaintiff is "morbidly obese"—5 feet 7 inches tall and weighing between 280 and 290 pounds.  A fellow worker has testified that the Plaintiff was "lazy" and was someone who had difficulty getting around the rig considering his substantial girth.  While other crewmembers have performed the same tasks as Hutchinson, not one crewmember has complained of any similar symptoms or medical problems.

The Plaintiff claims that he began to experience "hoarseness" in June of 2001.  However, the first time that he reported problems to anyone with Noble was on November 6, 2001, when he complained that he was losing his voice and that his throat was swollen.  When asked how this occurred, the Plaintiff wrote "do not know" on an incident report.  In his recorded statement, the Plaintiff attempted to attribute his breathing problems to possibly working around calcium bromide in completion fluid while changing pumps on the rig floor.  He claimed that when he repaired "trip tank pumps," he "had to get in it and waller (sic) in" the completion fluid on the floor.  Although it was the tank man's job to clean the floor, he admitted that he never once

2

asked the tank man to do so (instead choosing to wallow around in liquid that he claims made him cough from the very start). He also never requested a respirator, which everyone—including Hutchinson—acknowledges are readily available on the rig.

Despite the passage of almost one year from the time that he left the rig until the time of his recorded statement, the Plaintiff never mentioned to anyone that his exposure to hydrochloric acid was the source of his problems. When he was deposed almost two years later and after having filed a lawsuit, however, the Plaintiff changed his story. He attributed his symptoms to something new—the manner in which the Watermaker (a unit on the rig that changes saltwater to freshwater) was allegedly cleaned. He claimed that he would "break down the Watermaker" and would use an air gun to spray a hydrochloric acid solution (QD500L) on the coils of the bonnets. The manner in which the Watermaker was cleaned is now the focus of Hutchinson's claim. While two current crewmembers have testified that they used an air gun to clean the Watermaker merely in an attempt to remove excess scale buildup, no one instructed the Plaintiff to do the same. Furthermore, every crewmember has testified that they always wore a respirator while working around this chemical. The reason was simple—all crewmembers are trained to refer to product labels and Material Safety Data Sheets (MSDS) before working with chemicals. The MSDS and product label for QD500L warn against inhaling vapors, with the product label providing:

**ACID * CORROSIVE * CAUSES SEVERE BURNS * *VAPOR HARMFUL***

Accordingly, all crewmembers were on notice that respiratory protection was advisable while working around this chemical.

## II.  PLAINTIFF BEGINS TREATMENT, BUT NEVER MENTIONS ACID TO HIS PHYSICIAN

On November 6, 2001, the day that the Plaintiff first left the rig, he began treating with Dr. Klees, an Ear, Nose and Throat (ENT) physician, or otolaryngologist. On his first visit, the Plaintiff complained of hoarseness and difficulty swallowing, but never mentioned that chemicals aboard the rig were the source of his complaints.[1] When he returned to Dr. Klees for a third time the following month, the Plaintiff stated that calcium bromide in drilling mud on the rig was the cause.[2] Dr. Klees, however, sat down with the Plaintiff and his wife and stated that he was "unable to explain his ongoing symptoms."[3] The Plaintiff returned to Dr. Klees on five more occasions—the last being in April of 2003 or over sixteen months after the Plaintiff left the rig—and still had made no mention whatsoever of any type of acid on the rig being the cause of his complaints.[4]

## III.  PLAINTIFF IS FINALLY SHIPPED OFF TO A PHYSICIAN IN COLORADO, WHO ATTRIBUTES PLAINTIFF'S COMPLAINTS TO WORK-RELATED EXPOSURE TO CHEMICALS—AND NOT GERD—BASED UPON THE NEW HISTORY PROVIDED BY THE PLAINTIFF

With no physician able to attribute a cause to the Plaintiff's symptoms, the Plaintiff's attorneys shipped him off to Denver, Colorado, to be examined by Dr. Ronald Balkissoon, a physician whose focus is occupational asthma (and, of course, someone who is more inclined to attribute complaints to alleged exposures in the workplace). The first time that the Plaintiff ever reported exposure to hydrochloric acid to any physician was when he presented to Dr. Balkissoon for an examination in November of 2003, almost *two years* after he left the rig. Along with Reactive Airways Dysfunction Syndrome (RADS), vocal cord dysfunction, and muscle tension dysphonia, Dr. Balkissoon found that the Plaintiff was suffering from GERD and

---

[1]  *See* Deposition of John Frederick Klees, III, M.D. attached as Exhibit "A," p. 8.
[2]  *Id.* at 44.
[3]  *Id.* at 56.
[4]  *Id.* at 48.

post-nasal drip. In fact, following his examination and diagnosis of the Plaintiff, Dr. Balkissoon's recommendation for treatment was to "focus on treating his reflux disease and postnasal drip."[5]

## IV.   ALL OF PLAINTIFF'S PHYSICIANS ADMIT THAT GERD CAN CAUSE THE SAME ASTHMA-LIKE AND VOICE-RELATED SYMPTOMS

Dr. Balkissoon explained that patients suffering from GERD regurgitate stomach acid—the main component of which is hydrochloric acid—into the throat, which in turn is inhaled into the lungs. As a result, the patient can develop swelling and asthma-like symptoms.[6] In fact, all of the symptoms and conditions of which Plaintiff has complained can be present in a patient suffering from GERD:

> Q.   When regurgitated acid is inhaled into the lungs, that individual can develop asthma-like symptoms, can't they?
> A.   Yes, they can.
> Q.   And those symptoms include coughing?
> A.   Yes.
> Q.   Wheezing?
> A.   Yes.
> Q.   Hoarseness?
> A.   Yes.
> Q.   Chest pain?
> A.   Yes.
> Q.   Shortness of breath?
> A.   Yes.
> Q.   Bronchospasms?
> A.   Yes.
> Q.   Laryngospasms?
> A.   Yes.
> Q.   Broncrorestriction?
> A.   Yes.
> Q.   Bronchial hyperresponsiveness?
> A.   Yes.
> Q.   Inflammation of the bronchi?
> A.   Yes.
> Q.   Vocal cord dysfunction and muscle tension dysphonia?
> A.   Yes.

---

[5]   *See* Deposition of Ronald C. Balkissoon, M.D. attached as Exhibit "B ," p. 50.
[6]   *Id.* at 44.

> Q. In fact, all of these symptoms that I just named are consistent with a patient who presents with GERD; are they not?
>
> A. That's correct.[7]

Following his examination by Dr. Balkissoon in Denver, the Plaintiff was also examined by Dr. Judd Shellito, a second pulmonologist in New Orleans. Dr. Shellito explained how stomach acid can cause the same symptoms as asthma:

> A. Clinically, gastroesophageal reflux, as the acid hits the distal esophagus, can cause narrowing of the airways, or, usually, at night, typically with recumbency, as patients lie down. It may or may not be associated with what we recognize as heartburn. Patients with that can present either with heartburn, with shortness of breath, cough, or with cough alone, or with shortness of breath alone.
>
> Q. Strictly as a result the GERD?
>
> A. Correct.
>
> Q. And [pathophysiologically]?
>
> A. Pathophysiologically, it's believed the effects of gastroesophageal reflux on the airways could occur through two mechanisms. One is through the actual movement of stomach acid from the stomach to the esophagus and then through the trachea into the lungs *to cause an acid injury similar to the RADS that Mr. Hutchinson had from his exposure to acid on the oil rig*, or it may be a reflex mechanism where the acid doesn't actually get into the lungs but actually stimulates nerves within the lower esophagus that cause, through nerve pathways, the asthmatic reaction.
>
> Q. So the stomach acid produced by the condition known as GERD can cause the same symptoms as RADS?
>
> A. Well, it can cause the same symptoms as asthma, correct.[8]

Dr. Klees concurred, agreeing that GERD can produce the same asthma-like symptoms.[9]

As for causation, Dr. Balkissoon admitted that if he did not have the history of alleged exposure provided by the Plaintiff, he would have attributed the cause of the Plaintiff's complaints to GERD and post-nasal drip:

> Q. Assume for me, Doctor, that you did not have the history provided by Mr. Hutchinson of alleged exposure on the rig. Isn't it more

---

[7]     *See* Deposition of Ronald C. Balkissoon, M.D. attached as Exhibit "B ," p. 44-5.
[8]     *See* Deposition of Judd E. Shellito, M.D. attached as Exhibit "C," p. 33 (emphasis added).
[9]     *See* Deposition of John Frederick Klees, III, M.D. attached as Exhibit "A," p. 28-9.

likely than not that his vocal cord dysfunction would be the result
of GERD [and] post-nasal drip?

A.     Well, I would say that, yes, without the exposure history, the
natural presumption would be that his vocal cord dysfunction was
the result of reflux disease and postnasal drip, that's correct.

*     *     *

Q.     And also for his asthma-like symptoms?
A.     That's correct.[10]

The doctor admitted that only way that he could make the causative leap and attribute the

Plaintiff's complaints to work-related chemical exposure—as in most occupational lung cases—

is the temporal connection provided in the history of the patient:

Q.     In fact, as you just said, in many instances of occupational lung
disease, the only connection is the history and temporal relationship
provided by the patient, correct?

A.     It is the hallmark of occupational lung disease, that's correct.[11]

However, this causative leap of faith in relying on the Plaintiff's history as the foundation for

their opinion is insufficient as a matter of law when the physicians cannot support their opinions

with sufficient scientific data applicable to this case, especially when another plausible cause of

his complaints, such as GERD, has been confirmed by objective testing.

## LAW AND ARGUMENT

I.     **THE MERE TEMPORAL CONNECTION BETWEEN EXPOSURE AND THE ONSET OF
SYMPTOMS IS ENTITLED TO LITTLE WEIGHT IN DETERMINING MEDICAL CAUSATION**

The principles that govern the admissibility of expert testimony are found in Federal Rule

of Evidence ("FRE") 702:

If scientific, technical, or other specialized knowledge will assist
the trier-of-fact to understand the evidence or to determine a fact in
issue, a witness qualified as an expert by knowledge, skill,
experience, training, or education, may testify thereto in the form
of an opinion or otherwise.

---

[10]     *See* Deposition of Ronald C. Balkissoon, M.D. attached as Exhibit "B," p. 67-9.
[11]     *Id.* at 67.

7

In admitting expert testimony, Rule 702 requires the Court to make two preliminary determinations. First, the proffered witness must be qualified as an expert by knowledge, skill, experience, training or education.[12]   Second, the proffered expert's opinion, inference or other testimony must be based on scientific, technical or other specialized knowledge that will assist the trier-of-fact in understanding the evidence or determining a fact at issue.[13]   Importantly, the burden is on the party seeking to have the expert testimony introduced to demonstrate that the expert's findings and conclusions are based on some scientific method and are, in turn, reliable.[14] This requires "objective, independent validation of the expert's methodology."[15]

In *Daubert*, the United States Supreme Court set forth a five-factor test for assessing whether the methodology of an expert is scientifically valid or reliable, including:

1.   whether the expert's theory can be or has been tested;
2.   whether the theory has been subject to peer review and publication;
3.   the known or potential rate of error of technique or theory when applied;
4.   the existence and maintenance of standards and controls; and
5.   the degree to which the theory has been generally accepted in the scientific community.[16]

The Fifth Circuit has explained that the courtroom is not a laboratory. The reliability of the expert's opinions must be supported by reliable and existing data or research:

> In sum, the law cannot wait for future scientific investigation and research. We must resolve cases in our courts on the basis of scientific knowledge that is currently available. The inquiry authorized by Rule 702 is a flexible one; however, a scientific opinion, to have evidentiary relevance and reliability, must be based upon valid scientific principles.[17]

---

[12]   Federal Rule of Evidence 702.; *see also Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786, 2794 (1993).

[13]   *Id.*

[14]   *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *see also In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) (proponent of expert testimony must show by a preponderance of the evidence that the testimony is reliable).

[15]   *Moore v. Ashland Chemical, Inc.*, 151 F.3d at 276.

[16]   *Daubert*, 113 S.Ct. 2786, 2796-97.

[17]   *Moore v. Ashland Chemical, Inc.*, 151 F.3d at 276.

In *Moore v. Ashland Chemical*, the United States Fifth Circuit Court of Appeals upheld the exclusion of an expert physician's testimony following an *in limine* hearing at trial as to the cause of RADS because the testimony lacked an established scientific connection between the exposure and the alleged illness.[18]   The court explained that the mere temporal connection between exposure to a chemical and an onset of symptoms is entitled to little weight in determining causation.[19]

In *Ashland Chemical,* Moore was allegedly exposed to Toluene, a hazardous chemical, while working as a delivery truck driver.[20]   He arrived at Ashland Chemical's terminal in Houston, opened the back door of his trailer, and smelled a chemical odor from two leaking drums.  After reviewing a Material Safety Data Sheet (MSDS) for the spilled chemicals, Moore and the plant manager engaged in cleanup operations for approximately one hour.  The MSDS warned that depending upon the level and duration of exposure to fumes, irritation or injury to the lungs or other organs could result.[21]   Moore testified that he began experiencing dizziness, watery eyes and difficulty breathing approximately one hour after the cleanup.  He was later diagnosed with RADS by two pulomologists, Drs. Jenkins and Alvarez.[22]

At trial, Moore sought to offer testimony from both pulmonologists to establish that his exposure to the chemicals caused RADS.[23]   The defendants moved to exclude the testimony of one of the pulmonologists because the testimony was scientifically unreliable.[24]   Notably, the other pulmonologist had supported his opinion on medical causation with a specific study on

---

[18]     *Ahsland Chemical,* 151 F.3d at 278.
[19]     *Id.*
[20]     *Id.* at 271-72.
[21]     *Id.* at 271.
[22]     *Id.*
[23]     *Id.* at 272.
[24]     *Id.* at 273.

RADS involving a patient who was exposed to Toluene.  The jury, however, ultimately disagreed, finding in favor of the defendants.

After reviewing the prospective testimony of Dr. Jenkins at trial, the court held that Dr. Jenkins had no scientific basis for his opinion, that his opinion was not scientifically reliable, and that the court's duty as gatekeeper under *Daubert* prohibited it from allowing his opinions on medical causation into evidence.[25]  He was allowed to testify concerning his treatment and diagnosis of Moore, but was not allowed to offer any opinions on the cause of those complaints.

In affirming the district court's decision, the United States Fifth Circuit Court of Appeals held that Dr. Jenkins' testimony failed to meet the reliability standards set forth by the United States Supreme Court in *Daubert*.[26]  Specifically, Dr. Jenkins relied on the MSDS and the relatively short time between Moore's exposure and his onset of breathing difficulty in reaching his opinion on causation.  However, the Fifth Circuit noted that Dr. Jenkins had conducted no research on whether exposure to Toluene could cause RADS.[27]  He admitted that he did not know what tests had been conducted in generating the MSDS.  He did not know the level of the plaintiff's exposure to the chemical or what level of exposure to the chemical was necessary to cause a person to suffer adverse affects:

> Because he had no accurate information on the level of Moore's exposure to the fumes, Dr. Jenkins necessarily had no support for the theory that the level of chemicals to which Moore was exposed caused RADS.[28]

He offered no scientific support for his theory that exposure to Tolulene at any level could cause RADS.  Significantly, the Fifth Circuit noted that even if the doctor had scientific support for the

---

[25]     *Ashland Chemical*, 151 F.3d at 273.
[26]     *Id.* at 279.
[27]     *Id.* at 273.
[28]     *Id.* at 278.

theory that Tolulene could cause RADS, his lack of knowledge of the level to which Moore was exposed in that case would have made his opinion suspect in any event:

> Given the paucity of facts Dr. Jenkins had available about the level of Moore's exposure to the Toluene solution, his causation opinion would have been suspect even if he had scientific support for the position that Toluene solution could cause RADS in a worker exposed to some minor level of the solution. Under Daubert, *"any step that renders the analysis unreliable. . .renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."*[29]

In the end, Dr. Jenkins "was relegated to his fall-back position that *any* irritant to the lungs could cause RADS in a susceptible patient" at unknown levels.[30] However, he cited no scientific support for this conclusion. The theory had not been tested and had not been subject to peer review or publication. The potential rate of error had not been determined. The theory was not generally accepted in the medical community. Furthermore, the Fifth Circuit noted that Moore's medical history and the fact that he was a smoker made medical causation even more unreliable.[31] In sum, the Court concluded that the "analytical gap" between Dr. Jenkins' opinion on medical causation and the scientific foundation for that opinion was simply too wide. His causation opinion hinged on temporal connexity and not on reliable scientific data that would assist the trier of fact. As such, it was properly excluded under Rule 702.

## II. THE OPINIONS OF PLAINTIFF'S PHYSICIANS HINGE ON TEMPORAL CONNECTIONS WITHOUT SUFFICIENT SCIENTIFIC FOUNDATION FOR THOSE OPINIONS

Similarly, the Plaintiff in the case at hand seeks to introduce the testimony of three different physicians regarding medical causation—Drs. Balkissoon, Shellito, and Klees. However, none of these proposed expert physicians have offered sufficient scientific support for

---

[29]     *Ashland Chemical*, 151 F.3d at 278, n. 10 (emphasis in original and citation omitted).
[30]     *Id.* at 279 (emphasis in original).
[31]     *Id.* at 278.

their opinions on medical causation, instead relying on the history of the patient in linking his complaints to RADS instead of GERD.

## A.    Dr. Ronald Balkissoon

The Plaintiff never reported to Dr. Balkissoon the concentration or levels of exposure to calcium bromide or hydrochloric acid.[32]  He did not even report how many times he allegedly had been exposed to either chemical.[33]

Dr. Balkissoon—who has never treated a patient for exposure to chemicals on an offshore oil rig—admitted that he could not state the concentration or levels of exposure to calcium bromide that are required to produce any adverse medical effects:

> Q.      But as we sit here today, you can't tell us the duration and concentration of exposure to calcium bromide that's required to produce an adverse effect on a person's lungs such that it leads to RADS?
> A.    No.[34]

As for exposure to hydrochloric acid, he attempted to offer a speculative range, but could not say whether the Plaintiff was even exposed to that level in the requisite duration:

> Q.      And you can't tell us the concentration or duration of exposure to hydrochloric acid that is required to produce an adverse effect on a person's lungs such that it leads to RADS; is that fair?
> A.    I would say that there are reports that have looked at concentrations in the order of 30 parts per million, 50 parts per million or higher that are known to cause significant airway injury, so that's -- that's a round ballpark figure.
> Q.    But it has to be 30 parts per million or above?
> A.    Generally speaking, there are reports that at -- it may be less, depending again on duration, but 30 parts per million and up are recognized to probably lead to airway injury.
> Q.    So the record is clear, you're not sure the limits to which Mr. Hutchinson was allegedly exposed in this case?
> A.    If you mean do I not know his exact exposure levels, that's correct.[35]

---

[32]    *See* Deposition of Ronald C. Balkissoon, M.D. attached as Exhibit "B ," p. 51.
[33]    *Id.*
[34]    *Id.* at 54.
[35]    *Id.*

Moreover, Dr. Balkissoon did not know what tests were conducted in arriving at the MSDS for calcium bromide or hydrochloric acid.[36]  Importantly, Dr. Balkissoon stated that he had no scientific basis to differentiate or determine the significance of the Plaintiff's alleged exposure to calcium bromide versus hydrochloric acid:

> Q.    Is it your testimony that his alleged exposure to calcium bromide had nothing to do with his alleged complaint?
> A.    No, it's not.
> Q.    Can you tell us the percentages as far as the significance of exposure to calcium bromide versus his alleged exposure to hydrochloric acid?
> A.    There is *no scientific foundation* for trying to come up with that when we have no clear documentation of the exposure levels to either agent.[37]

Dr. Balkissoon also admitted that he had not conducted any research or published any articles on the effects of exposure to calcium bromide or hydrochloric acid.[38]  As in *Ashland Chemical*, Dr. Balkissoon relied on the "fall-back" position that a "wide variety of agents" are capable of causing RADS if there is exposure in a sufficient concentration and duration.[39]  In fact, he went even further and testified that the patient does not have to necessarily be "susceptible," as long as the concentration and duration are sufficient.[40]  Despite his generalized opinion, he had not conducted any research on this issue and had not published any articles on this issue.[41] In sum, Dr. Balkissoon conceded that the "hallmark of occupational lung disease" diagnosis is the temporal connexity between the exposure to chemicals and illness, which amounts to nothing more than a speculative and unreliable foundation for his opinion on causation in this case.[42]

---

[36]     *See* Deposition of Ronald C. Balkissoon, M.D. attached as Exhibit "B," p. 53.
[37]     *Id.* at 58 (emphasis added).
[38]     *Id.* at 56-7.
[39]     *Id.* at 59.
[40]     *Id.* at 60.
[41]     *Id.* at 59-61.
[42]     *Id.* at 66-67.

**B.    Dr. Judd Shellito**

Dr. Judd Shellito, a pulmonolgist at LSU, also opines that the Plaintiff suffers from RADS as a result of exposure to chemicals on Noble's rig.  Like Dr. Balkissoon, however, he cannot state the duration or concentration of exposure to calcium bromide or hydrochloric acid that is required to produce any adverse effects.[43]  He similarly cannot not state the concentration or duration of exposure that the Plaintiff even suffered in this particular case.[44]  Instead, Dr. Shellito deferred to an industrial hygienist or toxicologist, who he conceded is in the best position to comment on the concentration levels of a chemical that is needed to produce adverse effects on an individual's upper and/or lower respiratory tract.[45]

The only research that Dr. Shellito could uncover regarding possible adverse health effects from exposures to the chemicals at issue in this case was a single article on calcium bromide and skin irritation that he found on MEDLINE.[46]  Admittedly, he could find nothing more. He also admitted that his theory of causation as to hydrochloric acid was not supported by specific medical literature or research, instead pointing to "an emerging body of literature" related to exposure to irritants in general.    However, Dr. Shellito had not reviewed any publication dedicated to an analysis of irritants that can cause long-lasting injury to the lower respiratory tract. With no reliable scientific research of support, his testimony as to causation is similarly unreliable and dependent upon the history of the patient in the absence of specific medical research on these issues.

---

[43]    *See* Deposition of Judd E. Shellito, M.D. attached as Exhibit "C," p. 9-15.
[44]    *Id.* at 15.
[45]    *Id.* at 9.
[46]    *Id.* at 10.

## C.    Dr. John Klees

Notably, calcium bromide was the only chemical the Plaintiff ever mentioned to Dr. Klees.  Like the Plaintiff's other doctors,  Dr. Klees admitted that he did not know the level of concentration or duration of exposure to calcium bromide that the Plaintiff sustained.[47] Furthermore, Dr. Klees admitted that he had never reviewed an MSDS for calcium bromide.[48] He could not refer to any tests that were conducted in generating the MSDS for calcium bromide or what levels are required to cause even the slightest of adverse effects on a person.[49]   He conceded that he had not conducted any research or published any articles on the effects of exposure to the chemical.[50]  To the contrary, Dr. Klees admitted that the only evidence he had to relate the Plaintiff's condition to chemical exposure was the patient's subjective history of exposure:[51]

> Q.    So the only way for you to make the ultimate diagnosis of RADS as a result of work related exposure was the history provided by the patient?
>
> A.    That's—That's how I did, yes.[52]

The court's role as gatekeeper is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[53]  The expert physicians proposed by the Plaintiff have not set forth sufficient data, testing, research or assertions of general acceptance sufficient to establish the reliability of their prospective testimony.  Without evidence of the concentration or duration of exposure allegedly suffered by

---

[47]    *See* Deposition of John Frederick Klees, III, M.D. attached as Exhibit "A," pgs. 22, 24.
[48]    *Id.* at 23.
[49]    *Id.*
[50]    *Id.* at 24.
[51]    *Id.* at 37.
[52]    *Id.* at 39.
[53]    *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

the Plaintiff in this case, or the concentration or duration required to cause any damage, their opinions as to causation are unreliable as a matter of law and should be excluded.

## III.   THE TESTIMONY OF MULTIPLE PHYSICIANS AS TO TREATMENT, DIAGNOSIS AND CAUSATION IS CUMULATIVE, OVERLY PREJUDICIAL AND SHOULD BE EXCLUDED

The principles that govern the admissibility of relevant testimony are found in Federal Rule of Evidence 403:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Evidence is cumulative when it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of trial, with all the potential for confusion, as well as prejudice to other litigants, who must wait longer for their trial, that a long trial creates.[54] Where the proposed testimony of experts suggests that they will offer no new arguments or angles regarding the issue, then the testimony is properly excluded as cumulative under Federal Rule of Evidence 403.[55]

For example, testimony of medical experts as to the probability that a plaintiff would develop arthritis, and as to a plaintiff's specific disability rating, were properly excluded as cumulative even though the plaintiff's other expert had failed to provide a specific disability rating or testify to the odds of a plaintiff developing arthritis.[56]  In *Leefe*, the Fifth Circuit found that the proposed expert testimony of two doctors was nearly identical and that the plaintiff could sufficiently establish his medical condition through the testimony of one physician.[57]   The court

---

[54]   *U.S. v. Kizeart*, 102 F.3d 320 (7th Cir.1996).
[55]   *In re Air Crash Disaster*, 86 F.3d 498, 527 (6th Cir. 1998).
[56]   *Leefe v. Air Logistics, Inc.*, 876 F.2d 409, 411 (5th Cir. 1989).
[57]   *Id.*

explained that allowing both physicians to testify regarding the same alleged condition and resulting disability would be unnecessarily cumulative.[58]

Similarly, the Plaintiff's proposed pulmonologists in the instant case are both expected to offer the same diagnosis and theories on medical causation. Neither physician offers evidence that provides a different angle or theory of medical causation. To allow both physicians to testify regarding treatment, diagnoses and medical causation would be cumulative, repetitious and overly prejudicial to Noble Drilling, who is limited to one pulmonologist at trial.

## CONCLUSION

The Plaintiff's physicians offer no scientific support for the concentration or duration of exposure to calcium bromide or calcium chloride that is required to produce any adverse medical effects on an individual exposed to those chemicals. As the Fifth Circuit explained in *Ashland Chemical,* even if they had scientific support for the position that these two chemicals could cause the medical conditions at issue in this case, their opinions would still be suspect given the "paucity of facts" they had available about the level of exposure to the Plaintiff in this particular case. Their opinions are even more suspect in light of their concessions that the same symptoms about which the Plaintiff complains could be the result of GERD, a condition that objective testing confirms is present. While the physicians should be allowed to testify concerning their evaluation, treatment and diagnosis of the Plaintiff, any opinions on medical causation should be excluded as inherently unreliable. Additionally, to allow the Plaintiff to call multiple physicians at trial concerning the treatment, diagnosis and the cause of his complaints is cumulative and overly prejudicial. With Noble limited to two physicians as to the cause of the Plaintiff's breathing and throat complaints, Plaintiff should be restricted to one pulmonologist and one otolaryngologist as well.

---

[58]     *Leefe,* 876 F.2d at 411.

17

Respectfully submitted,

_____

THOMAS J. SMITH, T.A. (#17148)
TIMOTHY W. HASSINGER (#25085)
Galloway, Johnson, Tompkins, Burr & Smith
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139
Telephone: (504) 525-6802
Facsimile: (504) 525-2456
**Counsel for Noble Drilling (U.S.) Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon counsel of record by hand delivery this 14th day of February, 2005.

_____
TIMOTHY W. HASSINGER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| CHRISTOPHER HUTCHINSON | * | CIVIL ACTION NO. 03-1275 |
| | * | |
| VERSUS | * | SECTION "M" |
| | * | |
| NOBLE DRILLING (U.S.) INC. | * | MAGISTRATE "4" |
| *    *    *    *    *    *    * | * | |

## NOTICE OF HEARING

PLEASE TAKE NOTICE that the Motion *In Limine* to Exclude Opinions as to Medical

Causation and Cumulative Medical Testimony filed by Noble Drilling (U.S.) Inc. will be heard

on the __2nd__ day of ~~February,~~ *March* 2005 at __9:30__ a.m. before the Honorable Peter Beer, at the

United States District Court for the Eastern District of Louisiana.

Respectfully submitted,

THOMAS J. SMITH, T.A. (#17148)
TIMOTHY W. HASSINGER (#25085)
GALLOWAY, JOHNSON, TOMPKINS,
  BURR & SMITH
701 Poydras Street, 40th Floor
New Orleans, Louisiana  70139
Telephone:  (504) 525-6802
Fax:  (504) 525-2456
**Counsel for Defendant, Noble Drilling (U.S.) Inc.**

4

**SEE RECORD FOR
EXHIBITS
OR
ATTACHMENTS
NOT SCANNED**